**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| **MOBILE DATA TECHNOLOGIES LLC,** | |
| Plaintiff | Civil Action No. 7:22-cv-00244-ADA-DTG |
| **v.** | |
| **META PLATFORMS, INC.** | JURY TRIAL DEMANDED |
| Defendant. | [redacted] |
| | **PUBLIC VERSION** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. Mr. Wong's Declaration Should Be Struck, or Otherwise Disregarded .......... 2

1. The Private Factors Favor WDTX .......... 4

a. The Cost and Convenience of Willing Witnesses. .......... 4

b. Meta Fails to Discuss Witness Materiality or Relevance. .......... 4

c. MDT Identifies Many Witnesses for Whom Texas is More Convenient. .......... 6

d. WDTX is More Convenient and Safer for MDT's Witnesses. .......... 9

e. WDTX would realize cost savings and convenience. .......... 10

f. Prior Licenses to the Parents of the Patents-in-Suit were Done in Texas by Texas Residents. .......... 10

B. The Relative Ease of Access to Sources of Proof. .......... 11

C. The Availability of Compulsory Process. .......... 14

1. The Public Factors Favor WDTX .......... 17

a. WDTX Has a Strong Local Interest in this Matter. .......... 17

b. Court Congestion Weighs Against Transfer. .......... 19

c. The Final Public Factors are Neutral. .......... 20

III. CONCLUSION .......... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*In re BBC Int'l, Inc.*,
98 F.3d 1358 (Fed. Cir. 1996)....................4, 5

*Def. Distributed v. Bruck*,
30 F. 4th 414 (5th Cir. 2022) ....................2, 12

*Flygrip, Inc. v. Walmart, Inc.*
2022 WL 2373714 (W.D. Tex. June 29, 2022) ....................2, 4

*In re Google LLC*,
2021 WL 5292267 (Fed. Cir. Nov. 15, 2021)....................19

*Keynetik, Inc. v. Samsung Elecs. Co.*,
2023 WL 2003932 (Fed. Cir. Feb 15, 2023)....................5

*In re Planned Parenthood.*,
52 F.4th at 631 ....................10

*Rafqa Star LLC v. Google LLC*,
6-22-CV-01207-ADA, Dkt. 82 (Aug. 25, 2023) (Ex. 125)....................4, 12

*Resqnet.com, Inc. v. Lansa, Inc.*,
540 F.3d 860 (Fed. Cir. 2010)....................11

*Rusesabagina v. GainJet Avaiation S.A.*,
2023 WL 4853402 (W.D. Tex. July 28, 2023) ....................5

*VoIP-Pal.com, Inc v. Meta Platforms, Inc.*,
2022 WL 3021522 (W.D. Tex. July 28, 2022) ....................11, 12

*Word to Info, Inc. v. Facebook, Inc.*,
2015 WL 13870507 (N.D. Tex. July 23, 2015) ....................17

## I. INTRODUCTION

Relying solely on the unreliable representations of its serial declarant, Meta's Motion for Transfer [Ex. 9] takes a "California or bust" approach, ignoring relevant facts and witnesses with Texas connections. In doing so, it ignores the significant number of highly relevant party and non-party witnesses located in or near Austin, which includes the leaders and members of the team that developed and tested strategies for tailoring advertisements for mobile devices and the developer of the In-App Browser, both of which are key functionalities at issue in this case. Further, unlike MDT – which has identified specific witnesses as "will call" or "may call" witnesses for trial – Meta has stated that it cannot determine who it would call at trial.

Moreover, venue discovery has revealed that much of Meta's affirmative case for transfer rests on evidence that it would be charitable to characterize as unreliable. Meta's declarant, Nicolas Wong, [redacted] at his deposition before attempting to walk back his testimony after consulting with outside counsel for over a half hour. Further, Mr. Wong offered inconsistent testimony and revealed his "investigation" to be a cursory attorney-directed exercise. Likewise, venue discovery revealed that Meta's supposed [redacted] is just a litigation posture to enhance its transfer position and burden its opponents with unnecessary expense. [redacted]. The private-interest factors tilt in favor of venue remaining in this forum. And given the numerous connections between Meta's mobile app business and this forum, the public-interest factors likewise counsel in favor of denying the motion.

Accordingly, the transfer motion should be denied.

## II. ARGUMENT

"The burden to prove that a case should be transferred for convenience falls squarely on the moving party." *Flygrip, Inc. v. Walmart, Inc*. 2022 WL 2373714, at *3 (W.D. Tex. June 29, 2022). Defendants should expect and accept some inconvenience when sued. *Def. Distributed v. Bruck*, 30 F. 4th 414, 433 (5th Cir. 2022).

### A. Mr. Wong's Declaration Should Be Struck, or Otherwise Disregarded

Nicholas Wong, a member of Meta's litigation support team,[1] is Meta's sole fact declarant in support of transfer: he has submitted declarations on behalf of Meta some 30 times. Robinson Decl. ¶¶3-6. Here, he admitted Meta's counsel directed him to conduct his "investigation," but could not remember when they contacted him and refused to answer what objectives were given to him. Ex. 1 at 24:9-26:16. He admitted that his understanding of what technology was at issue in the case came solely from counsel. *Id.*, at 54:20-56:12.

Mr. Wong could not remember *when* he started his investigation, but we know that it ended on April 12, 2023, when he executed his declaration. *Id.*, at 23:12-15; Ex. 10. The earliest email turned over by Meta—which it claims is a complete production—is dated April 10.[2] Ex. 65. He did recall that Cliff Jao was one of the first people he interviewed, but Mr. Jao's notes show that he was contacted by Mr. Wong on April 11. Ex. 1 at 31:8-11; Ex. 90. In other words, his entire "investigation" with purportedly 40 to 50 interviews occurred over just two days. Ex. 1 at 34:16.

---

[1] The location of Mr. Wong's team, with the sole function of assisting Meta in litigations, should not carry weight on convenience regarding venue. Meta cannot insulate itself from litigation outside of NDCA by strategically limiting its litigation-assisting teams to its favored district.

[2] These emails are the only substantive evidence of the time spent by Mr. Wong in investigating; the earliest email dated April 10, 2023 (two days before the execution of his declaration). Exs. 65; 66, 67, 68, 69, 70, 71. Further, Mr. Wong testified that he did not recall ever being asked to gather all of his emails sent or received as part of his investigation. Ex. 1 at 29:4-7. MDT expressly requested the production of all such emails, so it is surprising that he was never asked.

And he did only a cursory review of his declaration, before he "verified" it.[3] Mr. Wong was also unable to "recall" much about his investigation or the creation of his declaration. *See e.g.*, Ex. 1 (24:9-11) (unable to recall when he learned he was doing a declaration), (31:1-11) (unable to recall if he spoke to individuals identified in his declaration and, if so, when), (33:1-16) (unable to recall how much time he spent on his investigation with any certainty), (34:8-16) (unable to recall how many people he spoke to in preparing his declaration), (62:3-63:14) (unable to recall when he first saw a draft of his declaration or his level of involvement in drafting and editing his declaration), (70:15-22) (unable to recall if he spoke with any former employees of Meta as part of his investigation).

But most concerning is Mr. Wong's [redacted]. *See* Ex. 92. [redacted]. Whether Mr. Wong's initial admission of

---

[3] For example, in response to an email from Mr. Wong, sent at 3:52 PM CST on April 11, 2023, Mr. Kevin Leddy provided 11 spreadsheets to Mr. Wong at 2:53 PM CST on April 12, 2023 – the same day Mr. Wong executed his declaration. Ex. 67. These spreadsheets contain some 520 individuals and were attached to Mr. Wong's declaration as Exhibits A through K. Ex. 10. It seems incredible that Mr. Wong could consider the information presented in the spreadsheets and attest that the same are "true and correct" within a couple hours after they hit his inbox.

[redacted] This is especially true beyond the [redacted].[4]

### 1. The Private Factors Favor WDTX

#### a. The Cost and Convenience of Willing Witnesses.

"The most important factor in the transfer analysis is the convenience of the witnesses." *Flygrip, Inc.*, 2022 WL 2373714 at *5. The inquiry focuses "on the cost and inconvenience imposed on the witnesses by requiring them to travel to a distant forum and to be away from their homes and work for an extended period of time." *Id.* (cleaned up). This Court recently held that this factor weighs against transfer when a movant's declarant is not credible, particularly where a plaintiff identifies relevant witnesses that would find WDTX more convenient. *Rafqa Star LLC v. Google LLC*, 6-22-CV-01207-ADA, Dkt. 82 (Aug. 25, 2023); (decision attached as Ex. 125).

This case represents just that.

#### b. Meta Fails to Discuss Witness Materiality or Relevance.

"When analyzing this factor, the Court should consider all potential material and relevant witnesses." *Id.*, at *5 (emphasis added). The "mere listing of a large number of witnesses by a party is not a persuasive reason for granting a change of venue without some evidence as to their necessity." *In re BBC Int'l, Inc.*, 98 F.3d 1358 (Fed. Cir. 1996) (emphasis added). A long list of witnesses should also be discounted if "it appears likely that much of the testimony would be cumulative." *Id.*, (emphasis added). These factors – necessity and cumulativeness – are the driving

[4] [redacted]

force behind requiring a movant to provide, "*[a]t an absolute minimum* . . . key witnesses and [] a brief summary of their likely testimony in an effort to demonstrate to the Court why it would be inconvenient for them to testify in [the forum]. Without a realistic and comprehensive summary of the testimony, it is impossible for the Court to determine if a witness's appearance is cumulative or unnecessary for trial." *Rusesabagina v. GainJet Avaiation S.A.*, 2023 WL 4853402 at *6 (W.D. Tex. July 28, 2023) (citation omitted, emphasis added).

Here, Meta fails to provide *any* evidence as to the necessity of *any* witness identified in Mr. Wong's declaration. *See* Ex. 9. Mr. Wong's declaration lists 10 Meta employees whom Mr. Wong describes [redacted] Ex. 10, ¶6. But Mr. Wong fails to explain why any identified individual is necessary, relevant, or what testimony these individuals may offer. *Id.*, ¶¶7-17. In fact, Mr. Wong admitted that *he was not representing that any of these individuals would be called at trial*, and further admitted that *they were not the most knowledgeable about the team for which they were identified*. Ex. 1 at 77:16-22, 140:8-15.

Meta minimizes witness testimony on infringement [redacted]" Ex. 9 at 13. [redacted] Writing code to achieve a function is considered trivial for a POSITA. *Keynetik, Inc. v. Samsung Elecs. Co.*, 2023 WL 2003932, at *2 (Fed. Cir. Feb 15, 2023).

At best, Mr. Wong generally [redacted]

[redacted]."[5] Ex. 10. But Meta stops short of saying any of them are actual trial witnesses *or even helpful to trial*. Indeed, Meta's counsel stated during meet and confers that [redacted] *See* Robinson Decl. ¶¶116, 117. During deposition, Mr. Wong [redacted] Without more, this does not provide sufficient support for transfer, as the Court – like Meta itself – will be unable to determine [redacted] *See id.*, at ¶¶ 102-105.

**c. MDT Identifies Many Witnesses for Whom Texas is More Convenient.**

MDT has identified [redacted] Texas-based important witnesses who can testify to the design and implementation of the accused functionalities, including the following:

- [redacted]: [redacted]

[5] Blinded by its California-focused hunt, Meta failed to investigate or otherwise interview numerous non-California based, but still relevant, employees. *See e.g.*, Ex. 6 at 11:12-24, 13:15-18 ([redacted], which is relevant to the accused products and infringement theories).

[redacted] *Id.*, at 20:18-21 As such, he is a will call witness for MDT. *See* Robinson Decl. ¶¶10-12. [redacted] resides in, and works out of, Austin, Texas. *Id.*, at 8:21-23. Mr. Wong did not identify or interview [redacted]

- **Harshit Saxena**: formerly led Meta's GeoLift solution for Facebook advertisements with the Marketing Science team. The GeoLift solution uses first-party data to help marketers understand the performance of advertisement campaigns associated with specific regions (*e.g.*, regions, cities, zip codes, etc.). Ex. 47. Mr. Saxena was pivotal to geolocation-based advertising via the Facebook mobile application – which is expressly laid out in MDT's infringement theories and contentions. Ex. 72; *see also* Robinson Decl. ¶¶51-53. [redacted]. Ex. 15. Mr. Wong did not identify or interview Mr. Saxena.

- [redacted] Ex. 4 at 31:6-8. [redacted] *Id.*, at 32:3-6; *see also* Robinson Decl. ¶¶19-21. [redacted] resides and works in Austin, Texas. *Id.*, at 9:14-19.

- **Mark Roenigk**: Director of Site Engineering for Meta. Ex. 17. Over the course of his career with Meta, Mr. Roenigk led hardware implementation efforts from "silicon/ASIC development through the design, manufacture, and deployment of network, compute, & AI/ML hardware in Meta data centers globally." *Id.* Thus, Mr. Roenigk is uniquely positioned to testify about the development and integration of silicon/ASIC hardware into Meta's data centers across

the globe, used to store data from the Facebook app – which is relevant to MDT's infringement theories and contentions. *See* Robinson Decl. ¶¶28-30. He resides and works in Austin, Texas. *Id.*

- [redacted] Ex. 18.[6] [redacted]. *Id.* [redacted] *Id.*; *see also* Robinson Decl. ¶¶16-18. [redacted] Ex. 5, 18:14-17; 19:4-23. [redacted] *Id.; see also* Ex. 5 at 14:24-25. Mr. Wong did not interview [redacted]. Ex. 5 at 21:24-25.

- **Ramanathan Vishnampet**: Software Engineer on the Responsibility & Privacy Team at Meta. Ex. 29. Mr. Vishnampet "[led] the infrastructure work for one of the two biggest product launches by Meta in 2022 in the area of Responsibility & Privacy," and "collaborat[ed] with research scientists and ML engineers to productionize state-of-the-art algorithms for explaining the extremely large and complex ML models used to deliver ads to 3 billion users globally." *Id.* On LinkedIn, Mr. Vishnampet described his role as "focus[ing] on building the infrastructure on top of [advertising] systems to explain why a particular ad is delivered to a particular user," wherein he "got to work with an amazing cross-functional team, which included engineers as well as product managers, UX researchers, and policy and legal experts." Ex. 30. Thus, Mr. Vishnampet is uniquely positioned to testify regarding the infrastructure surrounding Facebook's

[6] [redacted] Ex. 5, 7:3-16.

advertisements, which includes privacy settings and tailoring advertisements to consumers on the Facebook feed – which is directly relevant to MDT's infringement theories and contentions. *See* Robinson Decl. ¶¶22-24. Mr. Vishnampet resides in Houston, Texas. Ex. 29.

- **Clay Crepps**: Product Marketing Lead for North America at Meta. Ex. 20. Mr. Crepps "support[s] a team of product marketing managers leading go-to-market and growth of advertising solutions in North America, including in-stream and premium video ads, Instagram, Stories Ads, messaging, commerce and brand safety tools." *Id.* In his prior role as a Product Marketing Manager, he was responsible for "[d]riving go-to-market planning and growth efforts to brand marketing solutions, with a focus on video advertising in North America." *Id.* Thus, Mr. Creppes is uniquely positioned to testify regarding the implementation and revenue of video advertising, Stories, and Live video on the Facebook application – which is directly relevant to MDT's infringement theories and contentions. *See* Robinson Decl. ¶¶25-27. Presently, Mr. Crepps [redacted]

Considering the relevance of these and other identified witnesses – including at least nine (9) "will call" party witnesses, six (6) "will call" third-party witnesses, eight (8) "may call" party witnesses, and two (2) "may call" third party witnesses (*see* Robinson Decl. ¶¶10-86) – for which WDTX is a clearly more convenient venue, Meta has failed to meet its burden.

**d. WDTX is More Convenient and Safer for MDT's Witnesses.**

The Asserted Patents name three inventors: David Harper, Jason Sabella, and William Munch.[7] Mr. Harper and Mr. Sabella reside in Long Island, New York. By simple distance, transfer would force Mr. Harper and Mr. Sabella to travel twice the distance to the opposite coast. Ex. 7 at

[7] Over the Labor Day holiday, Mr. Munch unexpectedly passed away.

38:8-9 ("Well, I'd rather fly halfway across the country than completely across the country."); Bear Decl., ¶23. Mr. Harper is concerned with traveling to highly populated areas like NDCA due to medical issues. Ex. 7 at 38:8-39:16. Mr. Sabella shares the same concern as he has significant health problems. Mr. Harper also expressed safety concerns over traveling to NDCA given increasing crime, (*id.*), and Mr. Sabella echoes these concerns. Robinson Decl. ¶118. Mr. Harper and Mr. Sabella's safety concerns are not idiosyncratic. Within the last 30 days, the federal government has mandated that federal employees located in a building in downtown San Francisco (close to the Federal Courthouse) work from home as crime and drug use outside the Federal Building has resulted in unsafe conditions. Ex. 58; Ex. 59; Ex. 60. Convenience includes the ability to be safe. Thus, for MDT's witnesses, NDCA is much less convenient.

**e. WDTX would realize cost savings and convenience.**

For all witnesses who must travel—who are currently unknown as Meta has not identified any witnesses that it actually intends to call—holding the trial in the current venue will realize significant cost savings. *In re Planned Parenthood.,* 52 F.4th at 631 (Fifth Circuit affirming trial court's finding that venue had cost savings as to "hotels and restaurants"). Using the GSA CONUS reimbursement rates, which are based on empirical market conditions, lodging, food and incidentals would be $1,697 per witness in Midland and $2,529.50 per witness in San Francisco. Bear Decl., ¶¶ 11, 14. The average travel time to NDCA is nearly double the average travel time to WDTX from the location of witnesses actually expected to testify at trial. Bear Decl. ¶¶ 15-23.

**f. Prior Licenses to the Parents of the Patents-in-Suit were Done in Texas by Texas Residents.**

[redacted]

[redacted] Because these witnesses reside and work in Texas, they are only within this Court's subpoena power, and cannot be compelled to testify at trial in NDCA. (To the extent these witnesses are more than 100 miles from the courthouse, MDT confirms their travel within Texas will be paid).

**B. The Relative Ease of Access to Sources of Proof.**

Meta's sources of proof provide no weight for transfer. [redacted] Ex. 13; Ex. 12. [redacted] Ex. 13; Ex. 73. To the extent Meta's documents [redacted] Ex. 11. Further, Meta admitted that [redacted] thus even if Meta articulated some conceivable convenience (it does not), transferring the matter now will not realize any convenience. Ex. 1 at 97:15-21. Meta fails to offer any evidence that favors transfer. *VoIP-Pal.com, Inc v. Meta Platforms, Inc.*, 2022 WL 3021522, at *3 (W.D. Tex. July 28, 2022) (the inquiry is "the ease of access [to sources of proof] in the Western District of Texas relative to the ease of access in the Northern District of California.").

Meta's motion artfully games around the issue – focusing on [redacted]

[redacted]. Ex. 9 at 5-6 (emphasis added). However, this Court recently highlighted that "where documentation *will be collected* is not relevant and therefore has no bearing on this factor," as that only invites gamesmanship. *Gentex*, 2022 WL 2654986, at *3 (emphasis in original). None of these arguments point toward NDCA as the "clearly more convenient" forum under the actually applicable test. *VoIP-Pal.com, Inc. v. Meta Platforms, Inc.*, No. 6:20-CV-00267-ADA, 2022 WL 3021522, at *3 (W.D. Tex. July 28, 2022). Moreover, phrases such as [redacted] have no bearing on the actual location of any sources of proof. *Rafqa Star*, 6-22-CV-01207-ADA, Dkt. 82, (W.D. Tex., Aug. 25, 2023) (holding that similar language did not connote physical location or presence).

Nicholas Wong's declaration opines that [redacted] Ex. 10. (emphasis added). However, while in patent infringement cases "the bulk of the relevant evidence usually comes from the accused infringer," *Gentex*, 2022 WL 2654986, at *3, the Court may not "uncritically" accept a defendant's "conclusory assertions" that sources of proof are in a particular forum. *Def. Distributed*, 30 F.4th at 434. Rather, "[t]he movant has the burden to establish . . . an **actual** showing of the existence of relevant sources of proof, not merely an expression that some sources likely exist in the prospective forum." *Id.*, (emphasis added). Here, the burden to prove that NDCA is "clearly more convenient" cannot be satisfied by unspecific statements about [redacted] Rather, Meta must identify documents that are created and maintained in NDCA. *Rafqa Star*, 6-22-CV-01207-ADA, Ex. 125 (weighing access to sources of proof against transfer where the moving party failed to "identify actual documents, let

alone any located or even 'maintained' in NDCA."). Meta cannot do so, as it clarified [redacted]

Meta makes much ado about its source code, which it claims [redacted]. Ex. 10. First, [redacted] appears to be fabricated. Meta produced [redacted] Ex. 1 at 98:22; 103:11-13; Ex. 2 at 69:6-19. [redacted] Ex. 1 at 108:10-11. Likely, [redacted]—and even if it does, [redacted] *Id.*, at 97:8-99:3; Ex. 126 at 66:8-21; 68:17-69:21. Even assuming it is [redacted] Fed. R. Civ. Pro. 34(E)(i). All Meta's witnesses affirmed that [redacted] Ex. 1 at 97:8-14; Ex. 2 at 9:24-10:5; 12:1-14; 51:21-52:5. Beyond [redacted].

Finally, transferring now will not make accessing the source code more convenient [redacted]. Ex. 1 at 98:17-20. Even under [redacted]

[redacted] Ex. 1 at 111:11-14; 52:9-11. To the extent there is [redacted] it is because Meta's lead counsel has no Texas office. But Meta does (and in any event it cannot manufacture legally relevant inconvenience by choosing to rely principally on attorneys from out of state).

In contrast, the location of MDT's documents slightly weighs against transfer. While MDT also maintains its documents electronically, certain physical copies are located in this District. Ex. 7, 25:15-26:4. Ex. 8, 53:11-54:21; 55:11-57:6; *see also* Robinson Decl. ¶2. For the electronic documents, they are now stored with counsel in WDTX, but can be readily served anywhere. *Id.* None of MDT's documents are located in NDCA, thus a transfer would only create more inconvenience for MDT's production.

**C. The Availability of Compulsory Process.**

Meta's transfer analysis possesses a fatal blind spot—Meta made *no* effort to determine whether any *former* employees would be critical witnesses.[8] For the purposes of Mr. Wong's "investigation," anyone who was not employed at Meta when the investigation began was treated as though they did not exist without respect to what their involvement in the underlying substantive issues might have been during their employment. That issue has only gotten worse due to recent layoffs. Since MDT filed the Complaint in November 2022, Meta has laid off over 21,000 employees. Ex. 57.

[redacted]

In fact, [redacted]. Ex. 44; Ex. 45. [redacted] – [redacted] – are key witnesses in this case and reside in WDTX. Ex. 25; Ex. 46. The first, [redacted]. Ex. 25. [redacted]. *Id.* More importantly, [redacted]. *Id.* [redacted] is a key witness that will testify about [redacted] will also provide key testimony about [redacted]. The second, [redacted], was the [redacted]. Ex. 46. [redacted], who currently resides in Austin, [redacted]. *Id.*

Moreover, several witnesses identified in the Complaint are [redacted] *See* Ex. 2. For example, [redacted] resides in Austin, TX. Ex. 42. [redacted] resides in Austin, TX. Ex. 41. [redacted], resides in Austin, TX. Ex. 43. And [redacted] resides in Austin, TX. Ex. 26. Contrary to Meta's conclusory California-only narrative, these

individuals have key knowledge relevant to the accused products and related revenue generation. *See* Ex. 9 at 10.

In contrast, Meta has named two cumulative third-party prior art witnesses in NDCA – Adam Rosen and Lalgudi Kannan, inventors of Yahoo! Clubs – and a third, Event411.com (Daniel Jameson). Ex. 9. First, the Yahoo! Clubs inventors are cumulative. Second, prior art witnesses in general are unlikely to be deposed, much less called at trial, because the issue is typically the content of the public disclosure and comparison of it to the inventions claimed. But if Meta wants to go down that path, beyond Mr. Rosen, Kannan, and Jameson, Meta also disclosed nine total alleged prior art witnesses that reside in WDTX and other places in Texas. Robinson Decl. ¶¶87-93. And while Meta did not chart each of those prior art references, it appears that it has selected those references to be swapped into its existing preliminary invalidity charts at a moment's notice. *See* Dunn Decl. ¶¶8-15. As such, if prior art witnesses are in fact material, then by Meta's own disclosures the bulk of them reside outside of NDCA. *See id.*, ¶¶6-7.

Regardless, it is extremely unlikely that any prior art witness would be called to testify at trial – and Defendant's reliance on Adam Rosen, Lalgudi Kunnan, and Daniel Jameson is premature for several reasons. First, there has been no determination as to whether these asserted references are actually prior art and, if so, relevant. On this point, Meta did not explain the relevance of the prior art witnesses (Rosen, Kannan, Jameson) it used in support of its motion to transfer. Without such explanation, MDT cannot ascertain why Meta selected these alleged prior art witnesses over the other prior art witnesses. *See gen.* Dunn Decl.

Second, these references were cited in Defendant's ***preliminary*** invalidity contentions – which may well change before Defendant's ***final*** invalidity contentions. In fact, by Meta's own words, it "expects to gather additional information about the identified prior art, ***and other prior***

***art***, through discovery of Plaintiff and third-party discovery, and ***will thus amend and supplement these invalidity contentions*** once it obtains that discovery and has reasonable time to analyze it in a meaningful way." Ex. 117 at 10 (emphasis added). If Meta is not confident that this prior art will even be asserted come trial, it seems unreasonable that the location of the related prior artists should be considered on transfer.

Third, and relatedly, these references were cited in response to the ***currently*** asserted claims, which will necessarily be narrowed prior to trial. *See* OGP. In other words, even if these references are relevant prior art (which they are not), by the time trial comes the claims they are referenced against may no longer be asserted – thereby rendering associated prior artists irrelevant for purposes of trial.

### 1. The Public Factors Favor WDTX

#### a. WDTX Has a Strong Local Interest in this Matter.

"A local interest is demonstrated by a relevant factual connection between the events and the venue." *Word to Info, Inc. v. Facebook, Inc.*, No. 3:14-CV-04387-K, 2015 WL 13870507, at *4 (N.D. Tex. July 23, 2015). Here, and as alleged in the Complaint, the accused products are Meta's "social media and advertising applications and software known as Facebook which includes, but is not limited to the Facebook mobile app and in-app browser." Ex. 72 at ¶87. There is a strong local interest for at least the following reasons:

**Relevant witnesses in this District and Texas, in general**. As shown above, there are many relevant witnesses both in this District and in other places in Texas. In addition to the specific individuals identified throughout this response, as of August 24, 2023, Meta employs [redacted] full-time employees in Texas. Ex. 90. In response to Request for Production No. 12, (Exs. 91, 21, 74), Meta produced Excel files that list [redacted] team members [redacted] The [redacted] listed [redacted] Texas-based team members; the [redacted] file listed [redacted] Texas-based

team members; the [redacted] file listed [redacted] Texas-based team members; and the [redacted] file listed [redacted] Texas-based team members. *See* Robinson Decl. ¶¶111-115. Not only is this evidence of Meta's continued growth in Texas – which correlates with a growing local interest – but it also demonstrates an increase in Texas-based acts of infringement by Meta as the teams that work on the accused products have more and more members residing and working in Texas.

**Meta's facilities in this District and Texas, in general.** Meta has had a substantial, continuous presence in WDTX since at least 2010. Ex. 96. Meta has [redacted] *offices* in Texas, including [redacted] in Austin. Ex. 67. As shown, Meta uses these offices, in part, for work related to the accused products and reaps the benefits of being located in Texas. Given these facilities' direct impact on the Texas economy, Texas environment, Texas work force, and Texas residents in general, WDTX has a strong local interest in this matter.

**Meta's involvement in elections, and advertising in general**. Social media's involvement in elections and politics is a hot button issue, with public outcry focused on Meta and heightened attention paid in Texas. Recently, Meta partnered with University of Texas Professor Talia Jomini Stroud and New York University Professor Joshua A. Tucker to study the impact of Facebook and Instagram on the 2020 U.S. elections. Ex. 97; *see also* https://moody.utexas.edu/news/socialmediainelections (UT Website). Researchers involved in this study, including Austin-based Professor Talia Jomini Stroud, were provided "unprecedented access to data and research collaboration," (UT Website), and may prove relevant to this Action – given the studies focus on sharing content and advertisements via the accused products. This is directly relevant to MDT's infringement theories as sharing content to other users is at the crux of MDT's invention. On this point, Meta "support[s] political ads to target congressional districts in [the] U.S." using geo-targeting for electoral districts. Ex. 98. And, in general, makes use of

prediction algorithms to predict where users live (Ex. 99), and target advertisements based on a user's location (Ex. 100). Given the heightened interest in this issue among Texas residents, including UT Austin's involvement in the mentioned study, and the direct relevance to MDT's infringement theories, there is a strong local interest in keeping this matter in WDTX. Additionally, in prior cases, Meta, with support of a Nicholas Wong declaration, has affirmatively moved to transfer patent matters to the Austin division.[9] Ex. 1 at 19:6-12. See also Robinson Decl. ¶103.

**b. Court Congestion Weighs Against Transfer.**

The court congestion factor focuses on the estimated time to trial and comparing "the number of cases per judge and the speed and availability of other case dispositions." *In re Google LLC,* 2021 WL 5292267, at *3 (Fed. Cir. Nov. 15, 2021). Meta concedes that WDTX has a faster time-to-trial; but Meta understates this speed as their active cases per judgeship data is stale and not an accurate comparison. Ex. 9 at 14. WDTX has fewer active cases per judgeship than NDCA. Robinson Decl. ¶¶94-101. Accordingly, this factor heavily weighs against transfer. Furthermore, the *inter partes* review ("IPR") process takes an average of 736 days from filing to final decision. Robinson Decl. ¶106. This can add significant time to a patent case, especially in the NDCA where a stay of the litigation pending IPR is granted approximately 80% of the time. *Id.*, at ¶107. In WDTX, significantly fewer parties file for stays, and when they do, they are less likely to be granted. *Id.*, at ¶108. Even without this additional 2-years, WDTX moves patent cases to trial on average eleven months faster, so that, even with a stay, the average time to trial in WDTX takes less than half the time as in NDCA. *Id.*, at ¶¶109, 110.

[9] Although not expressly requested by the motion, MDT would consent to transferring this matter for trial in Austin, while retaining all pre-trial matters.

#### c. The Final Public Factors are Neutral.

The parties agree that both Courts are familiar with patent law, and there are no concerns regarding conflict of laws or foreign laws here. Thus, the remaining public factors are neutral.[10]

## III. CONCLUSION

For the foregoing reasons, among others, Meta's motion to transfer should be denied. Meta has failed to meet its significant burden to demonstrate that NDCA is a clearly more convenient venue than WDTX. MDT respectfully submits that the various private and public factors be weighed as follows:

| Transfer Factor | Outcome |
|---|---|
| Relative ease of access to sources of proof | ***Neutral or Slightly Against Transfer*** |
| Availability of compulsory process to secure the attendance of witnesses | ***Strongly Against Transfer*** |
| Cost of attendance for willing witnesses | ***Strongly Against Transfer*** |
| All other practical problems that make trial of a case easy, expeditious, and inexpensive | ***Neutral*** |
| The administrative difficulties flowing from court congestion | ***Strongly Against Transfer*** |
| The local interest in having localized interests decided at home | ***Strongly Against Transfer*** |
| The familiarity of the forum with the law that will govern the case | ***Neutral*** |
| The avoidance of unnecessary problems of conflicts of laws or the application of foreign law | ***Neutral*** |

10 [redacted]

Dated: September 14, 2023

Respectfully submitted,

By: */s/ Erick S. Robinson*
Erick S. Robinson, Lead Counsel
Texas Bar No. 24039142
Patrick M. Dunn
Texas Bar No. 24125214
Spencer Fane LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Telephone: (713) 212-2638
erobinson@spencerfane.com
pdunn@spencerfane.com

Danielle J. Healey
Texas Bar No. 09327
Brian Medich (Admitted W.D. Tex./
D.C. Bar No. 1671486)
Spencer Fane LLP
3040 Post Oak Blvd., Suite 1400
Houston, TX 77056
Telephone: (713) 212-2676
dhealey@spencerfane.com
bmedich@spencerfane.com

Kyle L. Elliott (admitted *pro hac vice*)
Missouri Bar No. 49145
Brian T. Bear (admitted *pro hac vice*)
Missouri Bar No. 61957
Kevin S. Tuttle (admitted *pro hac vice*)
Spencer Fane LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Fax: (816) 474-3216
kelliott@spencerfane.com
bbear@spencerfane.com
ktuttle@spencerfane.com

*Attorneys for Mobile Data Technologies LLC*

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that on September 14, 2023, Plaintiff served via e-mail containing a secure downloadable link to its Opposition to Defendant's Motion to Transfer and related Exhibits, filed under seal, to the following parties of record:

Heidi L. Keefe (CA Bar 178960)
Elizabeth L. Stameshkin (CA Bar 260865)
(Admitted *pro hac vice*)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Email: hkeefe@cooley.com
Email: lstameshkin@cooley.com

Phillip E. Morton
(admitted *pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Email: pmorton@cooley.com

***Courtesy copy:*** zmetamobiledata@cooley.com

*/s/ Erick S. Robinson*
Erick S. Robinson